2025R00839/JSG

RECEIVED
OCT 29 2026
AT 8:30 M
CLERK, U.S. DISTRICT COURT - DNJ

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Robert Kirsch |
| | : | |
| v. | : | Crim. No. 26-463 |
| | : | |
| PAUL BEERS | : | 18 U.S.C. § 1343 |

# INFORMATION

The defendant having waived in open court prosecution by Indictment, the United States charges:

## Background

1. At all times relevant to this Information:

a. Defendant PAUL BEERS ("BEERS") resided in New Jersey and operated a business, KJM Financial ("KJM"), located in Bedminster, New Jersey that offered clients, among other things, college planning and consulting services and financial planning services.

b. At times, BEERS was a registered securities broker.

c. BEERS had ownership and control over two bank accounts held at Bank-1.

d. Bank-1 was a publicly traded financial institution headquartered in Bedminster, New Jersey, with data servers located in Missouri and Texas.

e. Victims -1 through -65 were residents of California, Connecticut, Florida, Idaho, Massachusetts, Missouri, New Jersey, New York, Ohio, and Pennsylvania (collectively, the "Victim Investors").

f. Victim-36 was a married couple residing in New Jersey with joint investments with BEERS.

g. Company-1 was an American insurance corporation headquartered in Texas.

h. Company-2 was an American life insurance company headquartered in Minnesota.

i. Company-3 was an American life insurance and annuity company headquartered in Iowa.

## The Scheme

2. From at least as early as January 2015 to in or around November 2025, in Somerset County, in the District of New Jersey and elsewhere, the defendant,

**PAUL BEERS,**

did knowingly and intentionally devise and intend to devise a scheme and artifice to defraud the Victim Investors and others, and to obtain money and property from the Victim Investors by means of materially false and fraudulent pretenses, representations, and promises, as set forth below.

## Goal of the Scheme

3. The goal of the scheme was for BEERS, as an individual and through KJM, to profit unlawfully by fraudulently soliciting and accepting funds from the Victim Investors and to use those funds for personal and business expenditures and, in certain instances, to pay back prior Victim Investors in a Ponzi-like manner.

## Manner and Means of the Scheme

4. It was part of the scheme to defraud that:

a. BEERS held himself out to be a financial services professional to the Victim Investors and induced the Victim Investors to send funds to BEERS based on falsely leading the Victim Investors to believe that he would use the Victims' money for their respective benefit. At times, BEERS represented to the Victim Investors that he was investing their money, often into guaranteed income contracts, which are a particular type of investment vehicle that produces stable investment returns through fixed interest rates and principal returns.

*Victim-36*

b. In or around 2007 to 2008, BEERS provided college planning advice to Victim-36 for the benefit of their children. In or around January 2010, Victim-36 rolled a balance from a retirement account to Company-2 via BEERS. In or around 2021, Victim-36 moved approximately $30,000 into Company-3 based on BEERS' advice.

c. In furtherance of the scheme, from in or around June 2022 through October 2025, BEERS induced Victim-36 to write multiple checks to BEERS, payable to KJM, totaling approximately $947,715 by falsely representing to Victim-36 that BEERS would deposit and manage those funds in various accounts that he would maintain for the benefit of Victim-36. Victim-36 intended to use these accounts to pay for Victim-36's retirement and the costs associated with their children's college education, among other things.

d. Despite his representations to Victim-36, BEERS did not invest the approximately $947,715 that Victim-36 had provided him, and BEERS did not maintain those funds in investment accounts. Instead, BEERS comingled those funds with other funds in Bank-1 that BEERS had misappropriated from other Victim Investors and used

the collective funds to pay for business and personal expenses, including loans taken out to maintain operations at KJM, and to pay back other Victim Investors.

e. In furtherance of the scheme, BEERS created false performance reports on KJM letterhead that listed the name of the investment account, a contract number associated with the account, and the current value of Victim-36's accounts. BEERS provided the fraudulent reports to Victim-36 to prevent Victim-36 from discovering that BEERS was diverting Victim-36's funds for his personal and business use, and to pay back other Victim Investors. Those reports listed accounts associated with Company-1 that purportedly held Victim-36's investments, including account numbers. BEERS also created false quarterly reports; for example, one listed a "declared value" as of June 31, 205 [sic] with an associated "current interest rate" and an "accumulation value" of the investment. The report also included a "minimum guaranteed value" as of March 31, 2024 that included an "accumulation value" of the investment, and an associated interest rate. The false quarterly report also listed amounts associated with a "death benefit," a "total deposit" amount, and a "total bonus" of $9,100. The false "total bonus" was intentionally included by BEERS to misrepresent and inflate the value of the purported investment asset to induce Victim-36 into thinking that the investment was performing above expectations, and therefore to induce Victim-36 to continue to provide their funds to BEERS. The false quarterly statement included the following misrepresentation at the bottom of the document: "Assumed values are guaranteed through [Company-1]."

f. In one instance, in or around June 2025, BEERS induced Victim-36 to liquidate $20,000 from Company-2. BEERS had falsely informed Victim-36 that the

funds in Company-2 were not performing well and that BEERS could better manage the funds to provide a greater return on investment for Victim-36's benefit. Company-2 transferred funds to Victim-36 via Electronic Funds Transfer on or about June 18, 2025.

g. On or about June 24, 2025, BEERS inquired with Victim-36 via text message regarding the status of the $20,000 and whether Victim-36 had possession of the funds.

h. After Victim-36 received the funds from Company-2, Victim-36 wrote BEERS a check for $20,000 made payable to KJM. After BEERS received the check, he deposited it with Bank-1.

i. In or around November 2025, after being unable to contact BEERS, Victim-36 attempted to access their accounts with Company-1 and Company-2. Victim-36 attempted to access their accounts with Company-1 through Company-1's online account portal. After receiving a message that Victim-36's account with Company-1 could not be located, Victim-36 contacted Company-1's customer service hotline and provided Victim-36's account information as reflected on the account statements that had been provided by BEERS. Company-1 informed Victim-36 that the account numbers from BEERS' statements contained too few digits to be associated with a legitimate Company-1 account. Victim-36 provided social security numbers associated with Victim-36 to Company-1 in another attempt to locate their accounts. Company-1 had no record of any accounts associated with Victim-36. Victim-36 was also unable to access their accounts with Company-2 after receiving a message from Company-2 that their activity on the account was locked.

j. Ultimately, BEERS returned only $9,000 of the approximately $947,715 that Victim-36 had deposited with BEERS as a result of BEERS' fraudulent representations.

*Victims -1 through -65*

k. After receiving funds from the Victim Investors, BEERS deposited those funds into Bank-1 where they were commingled together rather than separated into individual accounts or investment vehicles for the respective Victim Investors.

l. Instead of investing their money as promised, BEERS misappropriated the Victim Investors' funds for his own benefit, without their knowledge or consent, and diverted those funds into Bank-1 for BEERS' personal use, which included paying loans taken out to maintain business operations at KJM, and to pay back prior Victim Investors in the manner of a Ponzi-like scheme. At times, BEERS induced certain Victim Investors to liquidate funds held in bone fide financial accounts and turn over the proceeds to BEERS for investment, which he then misappropriated.

m. In furtherance of the scheme, BEERS often, but not always, created false performance reports, often on KJM letterhead, including quarterly reports, that represented false reassurances and material omissions and purported to demonstrate the positive return on investment for the funds that the Victim Investors were induced to provide to BEERS. Those false account statements contained, among other things, fake account numbers and account balances for Company-1 and Company-2 that BEERS updated from time-to-time to demonstrate that the investments were performing as advertised. At times, BEERS also included a line item reflecting a "bonus" that was falsely presented as an additional deposit associated with the performance of

an investment, but was in reality a tool that BEERS used to falsely inflate the value of a particular account to prevent the Investor Victims from discovering BEERS' misappropriation of their funds.

n. In addition to the false account and quarterly statements provided to Victim Investors as described above, BEERS took additional steps to hide his fraudulent scheme and to maintain the trust of the Victim Investors by making occasional payments to certain Victim Investors derived from other Victim Investors' investments that BEERS falsely indicated reflected a return on their investments with BEERS in the manner of a Ponzi-like scheme.

o. In this manner, through false representations, BEERS caused the Victim Investors to send him in the aggregate at least approximately $11,096,817, resulting in aggregate losses of at least approximately $9,716,129 to the Victim Investors.

**Execution of the Scheme**

5. From at least January 2015 through in or around November 2025, in Somerset County, in the District of New Jersey and elsewhere, for the purpose of executing and attempting to execute the scheme and artifice to defraud described above, the defendant,

**PAUL BEERS,**

did knowingly and intentionally transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, as set forth below:

| Approximate Dates | Description |
|---|---|
| June 18, 2025 | $20,000 transmitted to Victim-36's bank account via Electronic Funds Transfer. |
| June 24, 2025 | Text message to Victim-36 regarding the $20,000. |
| June 25, 2025 | $20,000 mobile deposit of a check from Victim-36 to Bank-1, resulting in an interstate wire transmission that was initiated in New Jersey. |

In violation of Title 18, United States Code, Section 1343.

## FORFEITURE ALLEGATION

1. The allegations contained in this Information are incorporated by reference as though set forth in full herein for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

2. Upon conviction of the violation of Title 18, United States Code, Section 1343, as charged in this Information, the defendant,

**PAUL BEERS,**

shall forfeit to the United States, pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the commission of such offense, which in the aggregate, was approximately $9,716,129.

## SUBSTITUTE ASSETS PROVISION

If the property described above, as a result of any act or omission of the defendant:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek

forfeiture of any other property of the defendant up to the value of the above forfeitable property.

ROBERT FRAZER
United States Attorney

Jonathan S. Garelick
Assistant U.S. Attorney

Approved:

R. David Walk, Jr.
Deputy U.S. Attorney

CASE NUMBER: 26-463

# United States District Court
# District of New Jersey

**UNITED STATES OF AMERICA**

**v.**

**PAUL BEERS**

# INFORMATION FOR

**18 U.S.C. § 1343**

ROBERT FRAZER
UNITED STATES ATTORNEY

JONATHAN S. GARELICK
ASSISTANT U.S. ATTORNEY
TRENTON, NEW JERSEY
(609) 858-0307